# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

QUALITY STORES, INC., ET AL.,

Debtors.

)
)
)
)
)
)
)
)
)

Chapter 11

Case No. GG-01-10662
(Jointly Administered)

Hon. James D. Gregg

---

QSI HOLDINGS, INC. and QUALITY
STORES, INC.,

Plaintiffs,

v.

DAVID C. BLISS, TED G. BRITTON,
GARRY H. BROWN, CHRISTOPHER
CABOT, RICHARD CALAME, JOHN W.
CHILDS, RANDALL L. DEINES,
RICHARD C. DRESDALE, ALAN L.
FANSLER, JACK P. FEICHTNER,
HABIB Y. GORGI, KENNETH C.
HAINES, JOHN L. HILT, JERRY D.
HORN, JAMES F. HURLEY, BRETT A.
JONES, ERIC E. JORDAN, JOHN K.
KEENAN, JR., DONALD M. KETTLER,
PETER LAMM, G. DEAN
LONGNECKER, DAVID A. MADDOX,
GREGORY A. MANN, WAYNE E.
McCOLLUM, JAMES T. McKITRICK,
ROGER C. REBER, JAMES A. REECE,
THOMAS J. REINEBACH, CRAIG L.
SCARBOROUGH, STEVEN G. SEGAL,
DONALD O. SHILSTRA, RICHARD J.
STACY, JEFFREY STANTON, DENNY
L. STARR, RICHARD W. STEKETEE,
JR., ADAM L. SUTTIN, JEFFREY
SWARTZ, DEAN D. TRILLING, DAVID
TUIT, WILLIAM A. WAACK, BRIAN G.
WARD, WILLIAM E. WATTS, AND
DOE DEFENDANTS 1-50,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Adversary Proceeding No. _____

ADVERSARY PROCEEDING NO.
03-88076
DOCUMENTS REGARDING THIS
MATTER MUST BE IDENTIFIED BY
THE ADVERSARY AND DEBTOR
CASE NUMBERS.

FILED
03 JAN 31 AM 9: 23
DANIEL H. LAROUE, CLERK
U.S. BANKRUPTCY COURT
WEST. DIST. OF MICH.

ORIGINAL

**COMPLAINT OF QSI HOLDINGS, INC. AND QUALITY STORES, INC. FOR (i)
DISALLOWANCE OF PROOFS OF CLAIM FILED BY FORMER DIRECTORS AND
OFFICERS, (ii) BREACH OF FIDUCIARY DUTIES BY FORMER DIRECTORS AND
OFFICERS, (iii) NEGLIGENT INACTION AND (iv) CORPORATE WASTE**

Plaintiffs, QSI Holdings, Inc. ("QSI Holdings") and Quality Stores, Inc. ("Quality Stores"

and collectively with QSI Holdings, "Plaintiffs") by their Chief Litigation Officer Executive

Sounding Board Associates, Inc. ("ESBA"), and their undersigned counsel, hereby file this

adversary complaint against defendants David C. Bliss, Ted G. Britton, Garry H. Brown,

Christopher Cabot, Richard Calame, John W. Childs, Randall L. Deines, Richard C. Dresdale,

Alan L. Fansler, Jack P. Feichtner, Habib Y. Gorgi, Kenneth C. Haines, John L. Hilt, Jerry D.

Horn, James F. Hurley, Brett A. Jones, Eric E. Jordan, John K. Keenan, Jr., Donald M. Kettler,

Peter Lamm, G. Dean Longnecker, David A. Maddox, Gregory A. Mann, Wayne E. McCollum,

James T. McKitrick, Roger C. Reber, James A. Reece, Thomas J. Reinebach, Craig L.

Scarborough, Steven G. Segal, Donald O. Shilstra, Richard J. Stacy, Jeffrey Stanton, Denny L.

Starr, Richard W. Steketee, Jr., Adam L. Suttin, Jeffrey Swartz, Dean D. Trilling, David Tuit,

William A. Waack, Brian G. Ward, William E. Watts, and Doe Defendants 1-50 (collectively,

the "Defendants"), and in support thereof respectfully allege:

## JURISDICTION AND VENUE

1.       The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 157 and 1334,

paragraph L of this Court's Order Confirming First Amended Joint Plan of Reorganization of the

Debtors Under Chapter 11 of the Bankruptcy Code, dated May 3, 2002 (the "Confirmation

Order") and Article XIV of the above-captioned debtors' First Amended Joint Plan of

Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan").  This

is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.       Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2

## THE PARTIES

3.      On October 20, 2001 (the "Petition Date"), an involuntary petition (the "Involuntary Petition") was filed against Quality Stores by Century Funding Ltd., Century Funding Corp., Triton CBO III Limited, Triton CBO IV Limited and Pacholder High Yield Fund, Inc. under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Michigan (the "Court").  On November 1, 2001, (a) Quality Stores answered the Involuntary Petition and consented to the entry of an order for relief, and (b) the remaining affiliated debtors of Quality Stores (collectively with Quality Stores, the "Debtors") commenced their respective voluntary chapter 11 cases before this Court (the "Chapter 11 Cases").  The Chapter 11 Cases are being jointly administered by this Court.  On May 2, 2002, the Court confirmed the Debtors' Plan pursuant to the Confirmation Order.

4.      Pursuant to the Plan and the Confirmation Order, a Chief Litigation Officer was appointed in accordance with 11 U.S.C. § 1123(b)(3) to, among other things, prosecute causes of action that could be brought on behalf of the Debtors (the "Chief Litigation Officer").  (Plan, Article VIII; Confirmation Order, ¶ J.)  Joseph Myers was initially appointed to serve as the Chief Litigation Officer under the Plan.  (Confirmation Order, ¶ 6)

5.      On January 9, 2003, the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases filed a motion pursuant to section 1142(b) of the Bankruptcy Code for an Order Approving the Appointment of ESBA as the Chief Litigation Officer under the Plan.  An unopposed Certification of No Objection to the Appointment of ESBA as Chief Litigation Officer was filed on January 29, 2003, and by Order of the Court dated January 29, 2003, ESBA replaced Joseph Myers as the Chief Litigation Officer.

3

6.      Plaintiff QSI Holdings is a Delaware corporation and is currently conducting business in Michigan.

7.      Plaintiff Quality Stores is a Delaware corporation that conducted business in Michigan.

8.      Defendant David C. Bliss ("Bliss") is an individual who resides at 501 Ruddiman Drive, Muskegon, MI 49445.  Bliss was a member of the Debtors' Board of Directors and served as an officer of the Debtors at all times material.

9.      Defendant Ted G. Britton ("Britton") is an individual who resides at 1045 Ivanhoe Drive, Muskegon, MI 49445.  Britton served as an officer of the Debtors at all times material.

10.      Defendant Garry H. Brown ("Brown") is an individual who resides at 7223 Walker Road, Spring Lake, MI 49456.  Brown served as an officer of the Debtors at all times material.

11.      Defendant Christopher Cabot ("Cabot") is an individual who, upon information and belief, resides in the Commonwealth of Massachusetts.  Cabot served as an officer of the Debtors at all times material.

12.      Defendant Richard Calame ("Calame") is an individual who, upon information and belief, resides in the Commonwealth of Massachusetts.  Calame served as an officer of the Debtors at all times material.

13.      Defendant John W. Childs ("Childs") is an individual who resides at 421 Heath Street, Chestnut Hill, MA 02167.  Childs was a member of the Debtors' Board of Directors at all times material.

4

14.     Defendant Randall L. Deines ("Deines") is an individual who resides at 7200 Blackbob Drive, Stillwell, KS 66085.  Deines served as an officer of the Debtors at all times material.

15.     Defendant Richard C. Dresdale ("Dresdale) is an individual who resides at 29 Prescott Avenue, Bronxville, NY 10708.  Dresdale was a member of the Debtors' Board of Directors and served as an officer of the Debtors at all times material.

16.     Defendant Alan L. Fansler ("Fansler") is an individual who resides at 20 N. Bear Lake Road, Muskegon, MI 49445.  Fansler was a member of the Debtors' Board of Directors and served as an officer of the Debtors at all times material.

17.     Defendant Jack P. Feichtner ("Feichtner") is an individual who resides at 3440 Sand Dock Court, Muskegon, MI 49441.  Feichtner served as an officer of the Debtors at all times material.

18.     Defendant Habib Y. Gorgi ("Gorgi") is an individual who resides at 95 Tamarack Drive, E. Greenwich, RI 02818.  Gorgi was a member of the Debtors' Board of Directors at all times material.

19.     Defendant Kenneth C. Haines ("Haines") is an individual who resides at 7078 Bonaire Court, Rockford, MI 49341.  Haines served as an officer of the Debtors at all times material.

20.     Defendant John L. Hilt ("Hilt") is an individual who resides in Muskegon, Michigan.  Hilt was a member of the Debtors' Board of Directors at all times material.

21.     Defendant Jerry D. Horn ("Horn") is an individual who resides at 49641 Avila Drive, LaQuinta, CA 92253.  Horn was a member of the Debtors' Board of Directors and served as an officer of the Debtors at all times material.

5

22.     Defendant James F. Hurley ("Hurley") is an individual who resides at 2224 Norcrest Drive, Muskegon, MI 49441. Hurley served as an officer of the Debtors at all times material.

23.     Defendant Brett A. Jones ("Jones") is an individual who resides at 456 Melody Lane, Muskegon, MI 49445. Jones served as an officer of the Debtors at all times material.

24.     Defendant Eric E. Jordan ("Jordan") is an individual who resides at 180 Bart Street, Lamont Furnace, PA 15456. Jordan served as an officer of the Debtors at all times material.

25.     Defendant John K. Keenan Jr. ("Keenan") is an individual who resides at 1581 Flanagans Lane, Virginia Beach, VA 23456. Keenan served as an officer of the Debtors at all times material.

26.     Defendant Donald M. Kettler ("Kettler") is an individual who resides at 4350 Hackley Point Lane, Muskegon, MI 49441. Kettler served as an officer of the Debtors at all times material.

27.     Defendant Peter Lamm ("Lamm") is an individual who resides at 300 Central Park West, Apt. 14G, New York, NY 10024. Lamm was a member of the Debtors' Board of Directors at all times material.

28.     Defendant G. Dean Longnecker ("Longnecker") is an individual who resides at 6822 Eagle Ridge Drive, Johnston, IA 50131. Longnecker was a member of the Debtors' Board of Directors and served as an officer of the Debtors at all times material.

29.     Defendant David A. Maddox ("Maddox") is an individual who resides at 550 Hwy 155 South, McDonough, GA 30253. Maddox served as an officer of the Debtors at all times material.

6

30.    Defendant Gregory A. Mann ("Mann") is an individual who resides at 7981 Twin Creek Terrace, West Chester, OH 45069-2274. Mann served as an officer of the Debtors at all times material.

31.    Defendant Wayne E. McCollum ("McCollum") is an individual who resides at 100 Bear Lake Road, Muskegon, MI 49445. McCollum served as an officer of the Debtors at all times material.

32.    Defendant James T. McKitrick ("McKitrick") is an individual who resides at 4801 Island Pone Court, #304, Bonita Springs, FL 34134. McKitrick was a member of the Debtors' Board of Directors and served as an officer of the Debtors at all times material.

33.    Defendant Roger C. Reber ("Reber") is an individual who resides at 15696 River Side Drive, Spring Lake, MI 49456. Reber served as an officer of the Debtors at all times material.

34.    Defendant James A. Reece ("Reece") is an individual who resides at 1115 Brookway Court, Muskegon, MI 49441. Reece served as an officer of the Debtors at all times material.

35.    Defendant Thomas J. Reinebach ("Reinebach") is an individual who, upon information and belief, resides in the State of New York. Reinebach was a member of the Debtors' Board of Directors and served as an officer of the Debtors at all times material.

36.    Defendant Craig L. Scarborough ("Scarborough") is an individual who resides at 5649 Wisperwood Boulevard, #403, Naples, FL 34110. Scarborough served as an officer of the Debtors at all times material.

37.    Defendant Steven G. Segal ("Segal") is an individual who resides at 111 Huntington Avenue, Suite 2900, Boston, MA 02199-7610. Segal was a member of the Debtors' Board of Directors and served as an officer of the Debtors at all times material.

7

38.    Defendant Donald O. Shilstra ("Shilstra") is an individual who resides at 1452 Trent Wood SW, Wyoming, MI 49509. Shilstra served as an officer of the Debtors at all times material.

39.    Defendant Richard J. Stacy ("Stacy") is an individual who resides at 22786 Orchid Island, Boca Raton, FL 33428. Stacy served as an officer for the Debtors at all times material.

40.    Defendant Jeffrey Stanton ("Stanton") is an individual who resides at 4115 John Lynde Road, Des Moines, IA 50312. Stanton served as an officer of the Debtors at all times material.

41.    Defendant Denny L. Starr ("Starr") is an individual who served as an officer of the Debtors at all times material.

42.    Defendant Richard W. Steketee Jr. ("Steketee") is an individual who resides at 5680 Forest Glen Drive SE, Ada, MI 49301. Steketee served as an officer of the Debtors at all times material.

43.    Defendant Adam L. Suttin  ("Suttin") is an individual who resides at 47 Palmer Road, Waban, MA 02468. Suttin was a member of the Debtors' Board of Directors and served as an officer of the Debtors at all times material.

44.    Defendant Jeffrey Swartz ("Swartz") is an individual who, upon information and belief, resides in the State of New Hampshire. Swartz served as an officer of the Debtors at all times material.

45.    Defendant Dean D. Trilling ("Trilling") is an individual who resides at 10 Country Lane, Pepper Pike, OH 44124. Trilling served as an officer of the Debtors at all times material.

8

46.     Defendant David Tuit ("Tuit") is an individual who resides at 93 W. Division Street, Ada, MI 49341.  Tuit served as an officer of the Debtors at all times material.

47.     Defendant William A. Waack ("Waack") is an individual who resides at 17948 Wildwood Springs Parkway, Spring Lake, MI 49456-9241.  Waack was a member of the Debtors' Board of Directors and served as an officer of the Debtors at all times material.

48.     Defendant Brian G. Ward ("Ward") is an individual who, upon information and belief, resides in Grass Valley, California.  Ward served as an officer of the Debtors at all times material.

49.     Defendant William E. Watts ("Watts") is an individual who resides at 240 Academy Avenue, Sewickley, PA 15143.  Watts was a member of the Debtors' Board of Directors at all times material.

50.     Doe Defendants 1 through 50 are unnamed entities in addition to the named defendants that were involved in the transactions described below or otherwise benefited from the actions also described below.

51.     Defendants Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Reinebach, Segal, Suttin, Waack and Watts shall be referred to collectively as the "Directors" or the "Board" unless otherwise specified.  References to the activities of the "Directors" shall mean those individuals who constituted the Board of Directors of the Debtors at the time of the particular event described.

52.     Defendants Bliss, Britton, Brown, Cabot, Calame, Deines, Dresdale, Fansler, Feichtner, Haines, Horn, Hurley, Jones, Jordan, Keenan, Kettler, Longnecker, Maddox, Mann, McCollum, McKitrick, Reber, Reece, Reinebach, Scarborough, Segal, Shilstra, Stacy, Stanton, Starr, Steketee, Suttin, Swartz, Trilling, Tuit, Waack and Ward shall be referred to collectively as the "Officers" unless otherwise specified.  References to the activities of the "Officers" shall

9

mean those individuals who were serving as officers of the Debtors at the time of the particular event described.

## FACTUAL BACKGROUND

53.    On or about March 27, 1999, Central Tractor Farm & Country Inc. and CT Holdings (collectively, "Central Tractor"), an entity that was acquired by J.W. Childs Equity Partners, L.P. ("J.W. Childs") in November 1996, entered into an agreement (the "Agreement") with Quality Stores under which Central Tractor would acquire Quality Stores. On or about May 7, 1999, Quality Stores merged into Central Tractor, with Central Tractor emerging as the surviving corporation and changing its name to Quality Stores, Inc. (the "Company").

54.    After the merger, the Company began to experience financial difficulties, which were the result of, among other things, a number of ill-advised and grossly negligent decisions made by the Company's Board of Directors and certain of its Officers. Among the decisions that caused financial problems for the Company were an inventory over-buy that resulted from the Company's failure to properly integrate the computer systems of the merged companies into a properly functioning computer system; the application of an inappropriate business model for a highly leveraged company; the institution of an imprudent accounts payable strategy; an ill-advised decision to launch an internet retail site; and the continued payment of management fees to companies affiliated with members of the Board without the benefit of receiving material management services in exchange for those fees.

55.    Following the merger, Defendants decided to integrate the computerized inventory replenishment systems of Quality Stores and Central Tractor into a single automated system. Upon information and belief, the computer system integration was attempted in order to realize the expected synergies of the merger, which were never achieved.

56.    Prior to the merger, the purchasing and inventory processes at Quality Stores and Central Tractor were controlled centrally by the point-of-sale ("POS") and automatic replenishment systems. Both companies monitored customer purchases and inventory levels with respect to every stock-keeping-unit ("SKU") in each store on a daily basis through the POS system. The POS systems of both companies were interconnected with their automated inventory replenishment system. The automated inventory replenishment system was used to automatically place orders for new inventory and provide for minimum stocking levels for lower volume items at all stores.

57.    Shortly after the merger, Defendants realized that the two systems could not be successfully integrated and decided to use the existing non-Y2K compliant automated replenishment and ordering system known as the "E-3 System" that had been used by Quality Stores before the merger (the "E-3 System").

58.    Prior to the merger, the E-3 System served approximately 114 stores. Post-merger, the E-3 System was supposed to serve 347 stores, approximately 60,000 SKUs and a substantially increased number of vendors. Upon information and belief, Defendants knew that the E-3 System was not designed to handle the substantial increase in information required by the merging of the information systems, specifically, the larger volume of transactions, SKUs, stores and vendors.

59.    In order for the E-3 System to become operational for the Company, Defendants decided to reproduce historical sales on all of Central Tractor's, Quality Stores' and other affiliated entities' SKUs in the E-3 System.

60.    This process, referred to internally as "mapping," was crucial for the Company's future, since replenishment of the whole integrated company was contingent on the accuracy of this data and the E-3 System's ability to estimate the inventory requirements for the Company.

11

61.     Defendants knew that the lack of a reliable computerized replenishment system would adversely affect the Company's business operations. Because the E-3 System was not Y2K compliant, Defendants decided to accelerate the mapping of the replenishment data.

62.     Instead of reproducing Central Tractor's actual historical data in the E-3 System, Defendants significantly simplified the process and recklessly and without adequate study assumed that items previously sold by Central Tractor had identical historical sales patterns as similar items sold by Quality Stores. This assumption was entirely unsubstantiated, because historically, Quality Stores and Central Tractor had distinctly different product lines, targeted different buyers and operated in different regions with different sales and seasonality patterns.

63.     The mapping project was hastily accomplished over one week by a group of Company employees working in a hotel room. Specifically, Defendants entrusted the mapping and integration process to certain former officers of Central Tractor and failed to adequately supervise the integration process. None of the officers responsible for the integration process were expected to stay with the new merged entity, and none of them had any vested interest in the Company's future success.

64.     Defendants failed to adequately test the new E-3 System and did not have an adequate information technology infrastructure in place by the time the Company switched both systems over to the E-3 System. Further, the Company's computer system remained non-Y2K compliant.

65.     In March 2000, when the Company switched to using the new system, the E-3 System failed to correctly estimate the required SKU inventory levels at the Company's stores.

66.     Consequently, some SKUs were over-ordered, while others were under-ordered. As a result, the Company's distribution centers, where vendors initially delivered the

12

merchandise, became virtually paralyzed. Even if a product was ordered and available at the

distribution center, it could not be shipped to those stores that needed this product.

67.    In March 2000, Defendant Stanton, who was responsible for marketing and

merchandising, realized that the E-3 System was causing severe problems at the Company's

distribution centers. Without consulting the Board or the Debtors' management, Defendant

Stanton made an uninformed decision not to rely on the E-3 System for reordering and

personally ordered 100 additional trailers of spring merchandise to be delivered directly to the

Company's stores from vendors, bypassing the distribution centers. Upon information and

belief, Defendant Stanton did not have either the expertise or the information necessary to make

this decision or to place this order.

68.    Defendant Stanton's rash decision made the situation worse. The Company's

inventory ballooned by approximately $100 million; yet the merchandise was unable to reach the

stores.

69.    By the time the merchandise ordered by Defendant Stanton was delivered to the

stores, the spring sale season was over. The Company was left with over $60 million in unsold

spring merchandise, was lacking at least $20 million worth of fall inventory, had a past due debt

of $30 million with its vendors and was 85 days past due with its vendors. Consequently, the

Company experienced an acute cash flow crisis and was unable to order fall merchandise in the

quantity required to satisfy its customers. The unsold spring merchandise was stored until next

spring, at which time it was eventually sold below the cost. The Company suffered a loss of

$11.3 million as a result of this sale.

70.    Defendant Stanton's actions created an acute liquidity problem for the Company.

71.    Upon information and belief, Defendant Fansler was fully aware of the computer

integration problems and the problems with the E-3 System's failure to place replenishment

orders throughout this period. He had substantial experience with the POS and the E-3 System. Defendant Fansler, however, did nothing to correct the problem or stop Defendant Stanton from over-ordering inventory.

72.    Upon information and belief, at the end of 2000, the Company's computer systems were still not fully integrated.

73.    Upon information and belief, at or about the time Defendant Stanton over-ordered the spring merchandise, Defendants, in reckless disregard of the mounting over-ordering problem, also instituted a "trade-dating-for-discounts" strategy.

74.    In theory, "trade-dating-for-discounts" allows a company buying merchandise on a supplier's credit terms to receive larger discounts off a purchase price in exchange for a shorter term of repayment for the merchandise. This practice positioned the Company's trade payables to various suppliers as past due based on unusually short dating but allowed the Company to receive large volume discounts.

75.    The over-purchase problems, however, prevented the Company from taking advantage of the volume discounts, because, in fact, the Company was selling inventory significantly slower than it was initially anticipated, and it could not meet its payment obligations with the suppliers. As a result of shorter repayment periods, the Company was left with large past due amounts, and this, in turn, adversely affected the Company's credit standing and ability to purchase merchandise on a supplier's trade credit terms, which is crucial in the retail business.

76.    Upon information and belief, Quality Stores had historically operated at a 4.9% operating profit. This operating profit was significantly lower than the operating profit of Central Tractor, which was 7.5% prior to the merger.

14

77.    Given the total amount of debt borrowed by Central Tractor to finance the leveraged buyout, the Company needed to achieve a high level of operational profitability to service the debt.

78.    Faced with this dilemma, Defendants made a number of reckless and ill-considered business decisions.

79.    To lower the merchandise costs, and theoretically to increase business, Defendants instituted a bidding process among vendors. This process encouraged a greater number of vendors to contract with the Company than before the merger; however, the bidding process also resulted in vendors supplying previously unknown and untested brands to the Company. Further, the bidding process led to loyalty problems with those vendors with whom the Company previously did business.

80.    To increase sales, Defendants opened 25 new stores in 2000. However, to battle the Company's increasingly acute liquidity problems, Defendants recklessly decided to close a total of 28 stores in 2000. More than half of these stores were closed specifically in order to generate additional cash from the liquidation of the Company's inventories. Upon information and belief, this decision resulted in almost $12 million in losses, including $4.5 million in inventory liquidation losses, $1.2 million for asset impairment and $6.1 million for remaining lease obligations and other exit costs. The opening and closing of stores also required additional administrative expenses, adding to the already negative overall effect of the expansion strategy.

81.    In 2000, the Company's selling, general and administrative expenses ("SGA Expenses") rose. Upon information and belief, the Company's increased SGA Expenses adversely impacted the Company's net income for fiscal year 2000 to be decreased to 26.6% as compared to 29.1% in 1999.

15

82.     Moreover, the Company placed a disproportionate emphasis on advertisement and promotional pricing, which resulted in lower margins and, consequently, lower profits for the Company.  Upon information and belief, the Company experienced acute liquidity problems in fiscal year 2000, and, as a result, the Company's past due debt to merchandise vendors skyrocketed to $115 million.

83.     Not only did the Defendants' disproportionate emphasis on advertising and promotional pricing lead to lower profits for the Company, but Defendants' use of new and previously untested mediums of advertisement and promotions, such as television and concert sponsorships, went well beyond historical levels and the amount budgeted for advertising in 2000.  In fact, upon information and belief, Defendants increased advertisement and promotion expenses by $12 million in 2000 as compared with the amounts expended in 1999.

84.     Despite the increase in spending, the advertisement and promotion effort failed to produce any measurable benefit to the Company.  The Board itself recognized that this was an ill-conceived decision, which was not, upon information and belief, substantiated by any data or feasibility studies as to the effectiveness of either the new mediums of advertisement, or the effect of the increase in advertisement expenses.

85.     In addition to Defendants' reckless choices with regard to advertising and promotions on behalf of the Company, Defendants also made an uninformed decision to initiate a new business through creation of an on-line retail store.

86.     In 1999, the Company conducted surveys to determine whether its customers would buy products off a website.  Upon information and belief, these surveys were not based on any statistically proven methodology.  Based on the inherently flawed results of these surveys, the Company decided to create an e-commerce subsidiary, FarmlandCountry.com, which would design, launch and maintain the on-line retail store.

16

87.     On June 9, 2000, the Company launched its website,

www.FarmlandCountry.com.

88.     The website, however, got little customer response and was eventually shut down.

All employees of the e-commerce subsidiary were fired, and the equipment purchased in order to

run the website was brought to Des Moines, Iowa where the Company maintained the catalog-

processing center.

89.     The Company admitted that the decision to start the internet site was disastrous,

and, upon information and belief, was an uninformed and grossly negligent decision by the

Officers and Directors.

90.     Along with the computer integration, inventory over-buy and business structure

problems, Defendants were mismanaging corporate assets throughout this period.  For example,

Defendants continued to authorize the payment of management fees to two companies affiliated

with several members of the Debtors' Board of Directors, J.W. Childs and Fenway Partners, Inc.

("Fenway Partners"), even though the Company was not receiving any benefit in exchange for

those fees.

91.     In 1997, J.W. Childs and Fenway Partners entered into agreements with Central

Tractor to provide management and consulting services to Central Tractor for five years in

exchange for management fees (each, "Management Agreement," and collectively, the

"Management Agreements").  Upon information and belief, between 1997 and January 1999,

J.W. Childs received payments totaling at least $440,000, and Fenway Partners was paid at least

$150,000.

92.     The Management Agreements were still in effect after the merger of Central

Tractor and Quality Stores in May 1999.

17

93.    Upon information and belief, pursuant to the Management Agreement between J.W. Childs and the Debtors, J.W. Childs received fees totaling at least $470,000 in exchange for the alleged performance of management services on the Debtors' behalf in fiscal years 1999 and 2000.

94.    Additionally, upon information and belief, pursuant to the Management Agreement between Fenway Partners and the Debtors, Fenway Partners received at least $120,000 in exchange for the alleged performance of management services on the Debtors' behalf during fiscal year 2000.

95.    Upon information and belief, neither J.W. Childs nor Fenway Partners performed any material management services for the Debtors during fiscal years 1999 or 2000 under the Management Agreements.  Yet, Defendants did not halt the payment of these fees.

96.    In short, the Company's financial demise was a direct consequence of uninformed decision-making by the Company's Directors and Officers, self-dealing by members of the Board, and nonfeasance by various Directors and Officers.

### FIRST CLAIM FOR RELIEF
(OBJECTION TO DEFENDANTS' PROOFS OF CLAIM)

97.    Plaintiffs reallege paragraphs 1 to 96 as though fully set forth herein.

98.    In accordance with Bankruptcy Rule 3007, Plaintiffs object to the proofs of claim filed by certain Defendants in the Chapter 11 Cases.

99.    Pursuant to 11 U.S.C. § 502(b), Plaintiffs object to the proofs of claim filed by certain Defendants on the grounds that each claim is unenforceable against the Debtors and property of the Debtors under applicable law.

100.    Additionally, pursuant to 11 U.S.C. § 502(e), Plaintiffs object to the proof of claim filed by certain Defendants on the grounds that each claim should be disallowed as a claim

for reimbursement or contribution that was contingent as of the time the proofs of claim were made.

101.    Accordingly, under 11 U.S.C. §§ 502(b) and 502(e), each proof of claim filed by the Defendants should be disallowed and expunged in its entirety.

## SECOND CLAIM FOR RELIEF
### (BREACH OF FIDUCIARY DUTIES BY DIRECTORS)

102.    Plaintiffs reallege paragraphs 1 to 101 as though fully set forth herein.

103.    During the course of his tenure as a Director of the Debtors, each Director was under a duty to discharge his duties as a director in (a) good faith, (b) with the care an ordinarily prudent person in a like position would exercise under similar circumstances and (c) in a manner he reasonably believed to be in the best interests of the corporation.

104.    In breach of their fiduciary duties, the Directors mismanaged the Debtors, committed waste and failed to preserve the Debtors' assets, thereby allowing the assets of the Debtors to dissipate to the detriment of the Debtors and their creditors.

105.    The Debtors suffered damages as a direct result of the Directors' breach of their fiduciary duties.

## THIRD CLAIM FOR RELIEF
### (BREACH OF FIDUCIARY DUTIES BY OFFICERS)

106.    Plaintiffs reallege paragraphs 1 to 105 as though fully set forth herein.

107.    During his tenure as an Officer of the Debtors, each Officer was under a duty to exercise care and loyalty to the Debtors and to discharge his functions as an officer in the best interests of the Debtors.

108.    In breach of their fiduciary duties, the Officers mismanaged the Debtors, committed waste and failed to preserve the Debtors' assets, thereby allowing the assets of the Debtors to dissipate to the detriment of the Debtors and their creditors.

19

109.    The Debtors suffered damages as a direct result of the Officers' breach of their

fiduciary duties.

## FOURTH CLAIM FOR RELIEF
### (NEGLIGENT INACTION)

110.    Plaintiffs reallege paragraphs 1 to 109 as though fully set forth herein.

111.    By their unconsidered failure to take appropriate steps to correct the problems

associated with the integration of the computer systems, the Directors and several of the Officers

were negligent by inaction.

112.    The Directors' and Officers' failure to act was the proximate cause of losses

suffered by the Debtors and the estate.

## FIFTH CLAIM FOR RELIEF
### (CORPORATE WASTE)

113.    Plaintiffs reallege paragraphs 1 to 112 as though fully set forth herein.

114.    Defendants committed corporate waste with full knowledge that they were

allowing the assets of the Debtors to dissipate to the detriment of the Debtors and their creditors.

## SIXTH CLAIM FOR RELIEF
### (ATTORNEY'S FEES AND COSTS)

115.    Plaintiffs reallege paragraphs 1 to 114 as though fully set forth herein.

116.    Pursuant to Bankruptcy Rule 7008(b) and based on the allegations of this

Complaint, Plaintiffs request that they be awarded their attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, QSI Holdings, Inc. and Quality Stores, Inc., for and on behalf

of the Debtors, their estates and creditors, respectfully request that the Court: (a) enter judgment

against the Defendants for damages as a result of their breaches of fiduciary duties, negligent

inaction and corporate waste, including, but not limited to, the diminished value of the Debtors;

20

(b) award Plaintiffs their attorneys' fees and costs; and (c) grant Plaintiffs such other and further relief as is just and proper.

Dated: January 30, 2003.

Respectfully submitted,

By _Robert S. Hertzberg_

Robert S. Hertzberg (P30261)
PEPPER HAMILTON LLP
100 Renaissance Center, Suite 3600
Detroit, Michigan 48243
Phone: (313) 259-7110

-and-

John K. Cunningham
WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Phone: (305) 371-2700

Attorneys for QSI Holdings, Inc. and
Quality Stores, Inc. by their Chief Litigation
Officer