# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| QUALITY STORES, INC., ET AL., | ) |
| | ) Case No. GG-01-10662 |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Hon. James D. Gregg |
| | ) |
| ———————————————— | |
| QSI HOLDINGS, INC. and QUALITY STORES, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Adversary Proceeding No. 03-88076 |
| | ) |
| DAVID C. BLISS, GARRY H. BROWN, JOHN W. CHILDS, RICHARD C. DRESDALE, ALAN L. FANSLER, JACK P. FEICHTNER, HABIB Y. GORGI, JOHN L. HILT, JERRY D. HORN, JAMES F. HURLEY, PETER LAMM, G. DEAN LONGNECKER, DAVID A. MADDOX, GREGORY A. MANN, WAYNE E. McCOLLUM, JAMES T. McKITRICK, THOMAS J. REINEBACH, CRAIG L. SCARBOROUGH, STEVEN G. SEGAL, DONALD O. SHILSTRA, JEFFREY STANTON, DENNY L. STARR, ADAM L. SUTTIN, JEFFREY SWARTZ, WILLIAM A. WAACK, WILLIAM E. WATTS, AND DOE DEFENDANTS 1-39, | ) |
| | ) |
| Defendants. | ) |

FILED 03 DEC -5 AM 3:47 DANIEL M. LaVILLE, CLERK U.S. BANKRUPTCY COURT WEST. DIST. OF MICH.

---

**AMENDED COMPLAINT OF QSI HOLDINGS, INC. AND QUALITY STORES, INC. FOR (i) DISALLOWANCE OF PROOFS OF CLAIM FILED BY FORMER DIRECTORS AND OFFICERS, (ii) BREACH OF FIDUCIARY DUTIES BY FORMER DIRECTORS AND OFFICERS, (iii) NEGLIGENT INACTION AND (iv) CORPORATE WASTE**


ORIGINAL

Plaintiffs QSI Holdings, Inc. ("QSI Holdings") and Quality Stores, Inc. ("Quality Stores" or the "Company," and collectively with QSI Holdings, "Plaintiffs"), by their Chief Litigation Officer, Executive Sounding Board Associates, Inc. ("ESBA"), and their undersigned counsel, hereby file this adversary complaint and in support thereof respectfully allege:

## NATURE OF THE DISPUTE

1.     In March 1999, Central Tractor Farm & Country Inc. and CT Holdings (collectively, "Central Tractor") entered into a merger agreement with Quality Stores under which Central Tractor would acquire Quality Stores through a leveraged buyout, and the surviving corporation would change its name to "Quality Stores, Inc." On May 7, 1999, Quality Stores merged into Central Tractor.

2.     As a result of the leveraged buyout, between May 1999 and October 2001, Quality Stores was the largest agricultural specialty retailer in the United States. In October 2001, however, an involuntary petition (the "Involuntary Petition") was filed against Quality Stores by several creditors under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") because the Company was suffering from severe financial problems from which it could not recover.

3.     Quality Stores' demise was the direct result of financial difficulties that arose for two primary reasons: (i) the Company was insolvent, had been left with unreasonably small capital and had incurred debts beyond its ability to pay as a result of the leveraged buyout, and (ii) the defendants, who were officers and directors of Quality Stores between 1999 and 2001, made a series of grossly negligent decisions in acting, and were negligent or grossly negligent in failing to act-- all of which caused severe cash flow problems for Quality Stores and destroyed any chance the Company had of surviving post-merger.

4.      Among the decisions made by the officers and directors that caused financial problems for the Company were:  (i) the adoption of a business model that failed to provide for revenues sufficient to service debt; (ii) an inventory over-buy that resulted from the Company's failure to integrate the computer systems of the merged companies into a properly functioning computer system; (iii) the institution of an imprudent accounts payable strategy; (iv) the disproportionate allocation of inappropriate amounts of Company's resources to advertisement and promotional pricing; (v) an ill-advised launch of an internet retail site; and (vi) the continued payment of "management fees" to companies affiliated with members of the Board of Directors that were not providing management services.  These decisions affected matters that were material to the Company, and the officers and directors should have, but did not, adequately inform themselves before making decisions as to these critical issues.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to (i) 28 U.S.C. §§ 157 and 1334, (ii) paragraph L of the Court's order dated May 3, 2002 (the "Confirmation Order") confirming the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code dated March 8, 2002 (as amended, the "Plan") in the Chapter 11 Cases, and (iii) Article XIV of the Plan.

6.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).

7.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## CHAPTER 11 CASES

8.      On October 20, 2001 (the "Petition Date"), the involuntary petition (the "Involuntary Petition") was filed against Quality Stores by Century Funding Ltd., Century Funding Corp., Triton CBO III Limited, Triton CBO IV Limited and Pacholder High Yield Fund, Inc. under chapter 11of the Bankruptcy Code in this Court.  On November 1, 2001, (a)

Quality Stores answered the Involuntary Petition and consented to the entry of an order for relief, and (b) the remaining affiliated debtors of Quality Stores (collectively with Quality Stores, the "Debtors") commenced their respective chapter 11 cases (the "Chapter 11 Cases"). The Chapter 11 Cases are being jointly administered by this Court. On May 2, 2002, the Court confirmed the Debtors' Plan pursuant to the Confirmation Order.

9.       Pursuant to the Plan and the Confirmation Order, a Chief Litigation Officer was appointed in accordance with 11 U.S.C. § 1123(b)(3) to, among other things, prosecute causes of action that could be brought on behalf of the Debtors and creditors for the benefit of the Debtors' estates and creditors (the "Chief Litigation Officer"). Plan, Article VIII; Confirmation Order, ¶ J. Joseph Myers was initially appointed to serve as the Chief Litigation Officer under the Plan. Confirmation Order, ¶ 6.

10.      On January 9, 2003, the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases filed a motion pursuant to section 1142(b) of the Bankruptcy Code for an Order Approving the Appointment of ESBA as the Chief Litigation Officer under the Plan. An unopposed Certification of No Objection to the Appointment of ESBA as Chief Litigation Officer was filed on January 29, 2003, and by Order of the Court dated January 29, 2003, ESBA replaced Joseph Myers as the Chief Litigation Officer.

## THE PARTIES

11.      Plaintiff QSI Holdings is a Delaware corporation and is currently conducting business in Michigan.

12.      Plaintiff Quality Stores is a Delaware corporation that conducted business in Michigan.

13.      ESBA is the Chief Litigation Officer appointed under the Plan and the Confirmation Order. As the Chief Litigation Officer, ESBA brings this action on behalf of

Plaintiffs for the benefit of the Debtors' estates and creditors in the Chapter 11 Cases pursuant to the authority granted to it under (i) 11 U.S.C. § 1123(b)(3)(B), (ii) 11 U.S.C § 544, (iii) paragraphs D and J of the Court's Confirmation Order, and (iv) Article VIII of the Plan. Pursuant to paragraph J of the Confirmation Order and Articles XIV and XV of the Plan, all causes of actions of the Debtors, as debtors and debtors in possession in the Chapter 11 Cases, were preserved and could be prosecuted by the Chief Litigation Officer.

14.    Defendant David C. Bliss ("Bliss") is an individual who resides at 501 Ruddiman Drive, Muskegon, MI 49445. Bliss was an employee of Quality Stores from August 1974 to January 2001. In August 1999, Bliss was formally appointed Chairman of the Board of Directors of Quality Stores (the "Board of Directors") and Chief Executive Officer of Quality Stores. As CEO, Bliss was responsible for making informed decisions with respect to practically every aspect of Quality Stores' operations between August 1999 and January 2001. As a Director, Bliss was responsible for making informed decisions with respect to material issues concerning Quality Stores' business operations between August 1999 and January 2001.

15.    Defendant Garry H. Brown ("Brown") is an individual who resides at 7223 Walker Road, Spring Lake, MI 49456. In February 2000, he was formally elected by the Board of Directors to serve as Vice President of E-Commerce. As Vice President of E-Commerce, Brown was responsible for making informed decisions with respect to the online retail operations of Quality Stores between February 2000 and June 2000.

16.    Defendant John W. Childs ("Childs") is an individual who resides at 421 Heath Street, Chestnut Hill, MA 02167. Childs has been President of J.W. Childs Associates since 1995. In 1999, Childs was formally appointed to the Board of Directors. As a Director, Childs was responsible for making informed decisions with respect to material issues concerning Quality Stores' business operations between 1999 and October 2001.

17.     Defendant Richard C. Dresdale ("Dresdale) is an individual who resides at 29 Prescott Avenue, Bronxville, NY 10708.  Dresdale is a founding partner of Fenway Partners, and between 1999 and October 2001, he was a principal of Fenway Partners.  In August 1999, Dresdale was formally appointed to the Board of Directors.  As a Director, Dresdale was responsible for making informed decisions with respect to material issues concerning Quality Stores' business operations between August 1999 and October 2001.

18.     Defendant Alan L. Fansler ("Fansler") is an individual who resides at 20 N. Bear Lake Road, Muskegon, MI 49445.  Fansler was an employee of Quality Stores from June 1972 to January 2001.  In 1999, he was formally appointed to the Board of Directors and was elected by the Board of Directors to serve as Executive Vice President and Chief Operating Officer ("COO") of Quality Stores.  As a Director, Fansler was responsible for making informed decisions with respect to material issues concerning Quality Stores' business operations between 1999 and January 2001.  As an Executive Vice President and COO, Fansler was responsible for making informed decisions with respect to every aspect of Quality Stores' business operations between 1999 and January 2001.

19.     Defendant Jack P. Feichtner ("Feichtner") is an individual who resides at 3440 Sand Dock Court, Muskegon, MI 49441.  In August 1999, he was formally elected by the Board of Directors to serve as Vice President of Marketing and Advertising.  As Vice President of Marketing and Advertising, Feichtner was responsible for making informed decisions with regard to the advertising and marketing aspects of Quality Stores' business operations between 1999 and October 2000.

20.     Defendant Habib Y. Gorgi ("Gorgi") is an individual who resides at 95 Tamarack Drive, E. Greenwich, RI 02818.  In August 1999, Gorgi was formally appointed to the Board of

Directors. As a Director, Gorgi was responsible for making informed decisions with respect to material issues regarding Quality Stores' business operations between 1999 and October 2001.

21.    Defendant John L. Hilt ("Hilt") is an individual who resides at 2899 Scenic Drive, Muskegon, MI 49445. In August 1999, he was formally appointed to the Board of Directors. As a Director, Hilt was responsible for making informed decisions with respect to material issues regarding Quality Stores' business operations between August 1999 and October 2001.

22.    Defendant Jerry D. Horn ("Horn") is an individual who resides at 49641 Avila Drive, LaQuinta, CA 92253. In 1999, Horn was formally appointed to the Board of Directors. In January 2001, Horn was formally elected by the Board of Directors to serve as Chairman of the Board, President and CEO of Quality Stores. Horn resigned from Quality Stores in August 2001. As a Director, Horn was responsible for making informed decisions with respect to material issues regarding Quality Stores' business operations, and as President and CEO, Horn was responsible for all aspects of Quality Stores' business operations between 1999 and August 2001.

23.    Defendant James F. Hurley ("Hurley") is an individual who resides at 2224 Norcrest Drive, Muskegon, MI 49441. In August 1999, Hurley was formally elected by the Board of Directors to serve as Senior Vice President of Finance and MIS as well as Chief Financial Officer ("CFO") and Secretary of Quality Stores. As a Senior Vice President of Finance and MIS, CFO and Secretary, Hurley was responsible for making informed decisions with respect to material issues regarding Quality Stores' business operations and for all financial aspects of Quality Stores' business operations between August 1999 and May 2000, including technology-related functions such as computer integration.

24.    Defendant Peter Lamm ("Lamm") is an individual who resides at 300 Central Park West, Apt. 14G, New York, NY 10024. Between 1999 and October 2001, Lamm was

President of Fenway Partners. In August 1999, Lamm was formally appointed to the Board of Directors. As a Director, Lamm was responsible for making informed decisions with respect to material issues concerning Quality Stores' business operations between 1999 and October 2001.

25.     Defendant G. Dean Longnecker ("Longnecker") is an individual who resides at 6822 Eagle Ridge Drive, Johnston, IA 50131. Prior to May 1999, Longnecker was Executive Vice President and COO of Central Tractor. In 1999, Longnecker was formally appointed to the Board of Directors and served as an officer of the Debtors until November 2000. As a Director and Officer, Longnecker was responsible for making informed decisions with respect to material issues affecting Quality Stores' business operations between 1999 and November 2000.

26.     Defendant David A. Maddox ("Maddox") is an individual who resides at 550 Hwy 155 South, McDonough, GA 30253. In August 1999, Maddox was formally elected by the Board of Directors to serve as Vice President of Logistics. As Vice President of Logistics, Maddox was responsible for all transportation and logistics aspects of Quality Stores' business operations between August 1999 and August 2000.

27.     Defendant Gregory A. Mann ("Mann") is an individual who resides at 7981 Twin Creek Terrace, West Chester, OH 45069-2274. In August 1999, Mann was formally elected by the Board of Directors to serve as Vice President, Divisional Merchandise Manager. As Vice President, Divisional Merchandise Manager, Mann was responsible for making informed decisions with respect to the merchandise, vendors and inventory of Quality Stores between 1999 and November 2000.

28.     Defendant Wayne E. McCollum ("McCollum") is an individual who resides at 100 Bear Lake Road, Muskegon, MI 49445. In December 2000, McCollum was formally elected by the Board of Directors to serve as Vice President of Store Operations. As Vice

President of Store Operations, McCollum was responsible for making informed decisions with regard to retail store operations at Quality Stores between December 2000 and March 2002.

29.     Defendant James T. McKitrick ("McKitrick") is an individual who resides at 4801 Island Pone Court, #304, Bonita Springs, FL 34134. In 1999, McKitrick was formally appointed to serve on the Board of Directors, and in August 1999, he was formally elected by the Board of Directors to serve as President of Quality Stores. As a Director and President, McKitrick was responsible for making informed decisions with respect to material issues regarding Quality Stores' business operations and for all aspects of Quality Stores' business operations between August 1999 and November 2000.

30.     Defendant Thomas J. Reinebach ("Reinebach") is an individual who, upon information and belief, resides in the State of New York. Reinebach has been an employee of Quality Stores since June 2000. In July 2000, Reinebach was formally elected by the Board of Directors to serve as Senior Vice President of Distribution and Chief Information Officer ("CIO") of Quality Stores. In December 2000, Reinebach was formally elected by the Board of Directors to serve as Senior Vice President of Finance, CFO and Secretary of Quality Stores. In January 2001, Reinebach was formally appointed to the Board of Directors. In September 2001, Reinebach was formally elected by the Board of Directors to serve as Executive Vice President, CFO and Secretary. As a Director, CFO and Executive Vice President, Reinebach was responsible for making informed decisions concerning all aspects of Quality Stores' business operations between June 2000 and the present.

31.     Defendant Craig L. Scarborough ("Scarborough") is an individual who resides at 5649 Wisperwood Boulevard, #403, Naples, FL 34110. In August 1999, Scarborough was formally elected by the Board of Directors to serve as Vice President, Division Merchandise Manager. As Vice President, Division Merchandise Manager, he was responsible for making

informed decisions with respect to retail store operations at Quality Stores between 1999 and April 2000.

32.    Defendant Steven G. Segal ("Segal") is an individual who resides at 111 Huntington Avenue, Suite 2900, Boston, MA 02199-7610.  Between 1999 and October 2001, Segal was Senior Managing Director of J.W. Childs Associates and has been an executive of J.W. Childs Associates since July 1995.  In 1999, Segal was formally appointed to the Board of Directors and was formally elected by the Board of Directors to serve as Vice President of Quality Stores.  As a Director and Vice President, Segal was responsible for making informed decisions concerning material issues affecting Quality Stores and for business operations of Quality Stores between 1999 and October 2001.

33.    Defendant Donald O. Shilstra ("Shilstra") is an individual who resides at 1452 Trent Wood SW, Wyoming, MI 49509.  In August 1999, Shilstra was formally elected by the Board of Directors to serve as Vice President of Information Services.  As Vice President of Information Services, Shilstra was responsible for making informed decisions with respect to information technology aspects of Quality Stores' business operations between 1999 and June 2001.

34.    Defendant Jeffrey Stanton ("Stanton") is an individual who resides at 4115 John Lynde Road, Des Moines, IA 50312.  Prior to May 1999, Stanton was Senior Vice President, Operations, of Central Tractor.  In August 1999, Stanton was formally elected by the Board of Directors to serve as Senior Vice President of Merchandising and Marketing.  As Senior Vice President of Merchandising and Marketing, Stanton was responsible for making informed decisions with respect to all purchasing and marketing aspects of Quality Stores' business operations between 1999 and June 2000.

35.    Defendant Denny L. Starr ("Starr") is an individual who was an employee of Quality Stores from December 1997 to 2000. Prior to May 1999, Starr was Senior Vice President, Finance and CFO of Central Tractor. In February 2000, he was formally elected by the Board of Directors to serve as Senior Vice President of Finance, CFO and Secretary of Quality Stores. As Vice President of Finance, CFO and Secretary, Starr was responsible for making informed decisions concerning material issues affecting Quality Stores and for financial aspects of Quality Stores' business operations between December 1997 to December 1999.

36.    Defendant Adam L. Suttin ("Suttin") is an individual who resides at 47 Palmer Road, Waban, MA 02468. Between 1999 and October 2001, Suttin was a Managing Director of J.W. Childs Associates and has been an executive of J.W. Childs Associates since July 1995. In August 1999, Suttin was formally appointed to the Board of Directors. He also served as a Vice President of the Debtors until July 1999. As a Director and Vice-President, Suttin was responsible for making informed decisions concerning material issues affecting Quality Stores and for all aspects of Quality Stores' business operations until July 1999.

37.    Defendant Jeffrey B. Swartz ("Swartz") is an individual who, upon information and belief, resides in the State of New Hampshire. Swartz served as a Director and Vice President of the Debtors at all times material. As a Director and Vice President, Swartz was responsible for making informed decisions concerning material issues affecting Quality Stores and for all aspects of Quality Stores' business operations from August 1999 and until his resignation.

38.    Defendant William A. Waack ("Waack") is an individual who resides at 17948 Wildwood Springs Parkway, Spring Lake, MI 49456-9241. In August 1999, Waack was formally elected by the Board of Directors to serve as Vice President of Store Operations. In December 2000, Waack was formally elected by the Board of Directors to serve as Senior Vice

President and COO of Quality Stores. In January 2001, Waack was formally appointed to the Board of Directors. As a Director and Officer of Quality Stores, Waack was responsible for making informed decisions concerning material issues affecting Quality Stores and for all aspects of Quality Stores' business operations between August 1999 and March 2002.

39.    Defendant William E. Watts ("Watts") is an individual who resides at 240 Academy Avenue, Sewickley, PA 15143. In August 1999, Watts was formally appointed to the Board of Directors. As a Director, Watts was responsible for making informed decisions concerning material issues affecting Quality Stores between August 1999 and October 2001.

40.    Doe Defendants 1 through 39 are unnamed entities in addition to the named defendants that were involved in the transactions described below or otherwise benefited from the actions also described below.

41.    Defendants Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Reinebach, Segal, Suttin, Waack and Watts shall be referred to collectively as the "Directors" or the "Board" unless otherwise specified. References to the activities of the "Directors" shall mean those individuals who constituted the Board of Directors of the Debtors at the time of the particular event described.

42.    Defendants Bliss, Brown, Dresdale, Fansler, Feichtner, Horn, Hurley, Longnecker, Maddox, Mann, McCollum, McKitrick, Reinebach, Scarborough, Segal, Shilstra, Stanton, Starr, Suttin, Swartz and Waack shall be referred to collectively as the "Officers" unless otherwise specified. References to the activities of the "Officers" shall mean those individuals who were serving as officers of the Debtors at the time of the particular event described.

## BACKGROUND

### The Leveraged Buyout

43.     On or about March 27, 1999, Central Tractor, an entity that was acquired by J.W. Childs Equity Partners, L.P. ("J.W. Childs") in November 1996, entered into an agreement (the "Agreement") with Quality Stores under which Central Tractor would acquire Quality Stores (the "Quality LBO").

44.     When Central Tractor entered into the Agreement with Quality Stores, it was already carrying substantial "goodwill" on its books as a result of the "excess cost" paid by J.W. Childs when it acquired Central Tractor and the "excess cost" paid by Central Tractor when it acquired Country General Inc. ("Country General") in June 1997. As of May 7, 1999, Central Tractor showed "goodwill" on its books totaling $133.14 million.

45.     On or about May 7, 1999, Quality Stores merged into Central Tractor, with Central Tractor emerging as the surviving corporation and changing its name to "Quality Stores, Inc."

46.     The purchase price (the "Purchase Price") for the Quality LBO under the Agreement was approximately $208 million, consisting of (i) $111.5 million in cash (the "LBO Consideration"), and (ii) the issuance to Quality Stores' shareholders of 792,430 shares of CT Holdings stock allegedly valued at $91.8 million. In addition, Central Tractor agreed to repay $42.1 million of Quality Stores' existing indebtedness.

47.     Central Tractor obtained loans under a Credit Agreement dated May 7, 1999 (as amended from time to time, the "Prepetition Credit Facility") by among Central Tractor, Fleet National Bank, as lender and administrative agent, and the lenders party thereto. The Prepetition Credit Facility consisted of a $220 million term loan (the "Term Loan") and a $100 million revolving credit facility (the "Revolving Facility").

48.     The Prepetition Credit Facility significantly increased the Debtors' liabilities as compared to the combined liabilities of Central Tractor and Quality Stores prior to the Quality LBO.  Upon the closing of the Quality LBO, borrowings under the Prepetition Credit Facility were secured by first priority liens on, and security interests in, substantially all of the assets of the Debtors.

49.     As stated in the Form 10-K of Quality Stores for the fiscal year ended January 29, 2000 and filed with the Securities and Exchange Commission on April 28, 2000 (the "1999 10-K"), Quality Stores reported that the estimated cost of the Quality LBO exceeded the allocated fair value of the underlying tangible net assets acquired in the transaction by approximately $164 million.

50.     The "excess cost" was accounted for as "goodwill" on the consolidated balance sheet of Quality Stores and was added to the existing "goodwill" reflected on the balance sheets of Central Tractor and Quality Stores prior to the Quality LBO in the approximate amounts of $89.1 million and $48.2 million, respectively.  After the Quality LBO, Quality Stores' consolidated balance sheet reported total "goodwill" of approximately $287 million.

51.     As a result of the Quality LBO, the Debtors' liabilities exceeded the fair value of their assets and the Debtors, thus, were insolvent within the meaning of Section 566.32(1) of the Michigan Uniform Fraudulent Transfer Act, Michigan Comp. Law §§ 566.31 et. seq. ("MUFTA").  Alternatively, the Debtors' were in the zone of insolvency.

**Integration of Central Tractor and Quality Stores**

52.     One of the most important decisions for Defendants was the creation and adoption of a business model that could support the substantial debt service incurred in connection with the Quality LBO.  Central Tractor's business model generated margins well in excess of those generated by Quality Stores.  Neither Central Tractor nor Quality Stores, however, operated with

sufficient EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) margins (as percentage of sales) to support the debt incurred in, and following, the Quality LBO.

53.     Upon information and belief, prior to and after the Quality LBO, Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, McKitrick, Segal, Suttin, Swartz, and Watts (the "LBO Directors") and Officers Fansler, Longnecker, McCollum, Starr, and Stanton (the "LBO Officers," and collectively with LBO Directors, the "LBO Defendants") determined to adopt Central Tractor's business model based on Quality Stores' business infrastructure and personnel, notwithstanding Quality Stores' significantly lower EBITDA margin. To this end, Central Tractor terminated all or substantially all personnel working in its headquarters and relocated the headquarters from Des Moines, Iowa into the former Quality Stores' headquarters in Muskegon, Michigan.

54.     The LBO Defendants either ignored or failed adequately to inform themselves about the problems and additional expenses arising as a result of the integration of Quality Stores, Central Tractor and Country General into a single integrated company based on Quality Stores' infrastructure and personnel and Central Tractor's pre-Quality LBO business model.

55.     In light of such problems, the LBO Defendants manufactured a series of totally unrealistic assumptions to support the business model. The LBO Defendants "projected" that Quality Stores' sales would consistently exceed 10% in annual growth by opening new stores. This projection required Quality Stores to open 25 additional stores in 2000 and 40 to 50 additional stores per year thereafter, while keeping all existing stores in operation. The LBO Defendants also "assumed" that Quality Stores' EBITDA margin would improve at a rate that exceeded the assumed growth in net sales by reducing duplicative overhead.

56.     Historically, neither Quality Stores nor Central Tractor had ever expanded at the pace Central Tractor had projected. The LBO Defendants were aware that, between 1997 and

January 2000, Quality Stores and Central Tractor opened a total of 28 new stores and closed 29 stores, resulting in a net decrease in the overall number of stores. The LBO Defendants could not reasonably assume that Quality Stores would be able to open an additional 175 stores on a net basis over the following four years.

57. The LBO Defendants also either ignored, or failed to consider, the enormous expense associated with the adopted business plan. The expense for opening new stores was approximately $1.1 million or more, per store. Thus, the LBO Defendants were planning to make capital investments of $45 to $55 million annually.

58. In addition to the cost of expansion, Quality Stores also had to pay interest and repay the principal under the Term Loan and the Revolving Facility in the amount of $34.6 million in 1999 and $47.9 million in 2000.

59. Moreover, the LBO Defendants were planning to incur substantial integration expenses totaling roughly $15.8 million in 1999. These sizeable integration costs related to the closing of Central Tractor's corporate headquarters in Des Moines, Iowa and the relocation of the company's headquarters to Muskegon, Michigan. The integration costs also included severance and retention payments for employees and the expenses associated with closing a number of facilities that Central Tractor had been leasing.

60. The LBO Defendants either ignored, or failed to consider, that Quality Stores could not remain in business given the combination of the scheduled debt repayment, capital investments and integration expenses, unless Quality Stores achieved a dramatically higher EBITDA margin than that of Central Tractor. The LBO Defendants caused Quality Stores to incur debts beyond its ability to repay and left Quality Stores with unreasonably small assets in relation to its business.

61.    The LBO Defendants were aware, or should have been aware, of the precarious financial position that Quality Stores was in after the Quality LBO. Despite their knowledge that Quality Stores was either insolvent or was on the brink of insolvency, the LBO Directors failed to take any steps to protect interests of Quality Stores and its creditors.

62.    Shortly after the Quality LBO, Quality Stores was forced to borrow funds under the Revolving Facility in order to finance its operations for the remainder of 1999. Without these funds, Quality Stores had no other means to meet its debt obligations while simultaneously continuing its operations.

63.    By early 2000, Quality Stores had depleted the funds available to it under the Revolving Facility and was forced to borrow additional funds in order to continue its operations.

64.    As a result, on March 31, 2000, the Term Loan and the Revolving Facility were amended to increase the total available borrowings to $374.6 million from $320 million. The Term Loan was increased to $214.6 million and the Revolving Facility was increased to $160 million.

65.    Unable to service its debt, Quality Stores defaulted under the Prepetition Credit Facility in the second quarter of 2000. In September 2000, and again in February 2001, the Term Loan and the Revolving Facility were amended to address Quality Stores' defaults under the Prepetition Credit Facility. In June 2001, Quality Stores announced the hiring of Peter Fitzsimmons of AlixPartners (a crisis management firm) as CEO of Quality Stores.

66.    Prior to the Quality LBO, Quality Stores and Central Tractor were viable and profitable entities. As a result of the combination of excessive debt, unreasonably small remaining capital, and the grossly negligent actions and inactions described herein, Quality Stores was unable to fund its business operations and pay its creditors.

## Director and Officer Breaches of Fiduciary Duties, Negligent Inaction and Waste

67.    After the Quality LBO, the Defendants entered into and carried out a series of reckless, uninformed and grossly negligent decisions that ruined the Company. These decisions and actions exacerbated the Company's financial difficulties and ultimately led to the Company's demise.

68.    Among the decisions made by the Defendants that caused Quality Stores' failure were: (i) the adoption of a business model that failed to provide for revenues sufficient to service debt; (ii) an inventory over-buy that resulted from the Company's failure to integrate the computer systems of the merged companies into a properly functioning computer system; (iii) the institution of an imprudent accounts payable strategy; (iv) the disproportionate allocation of inappropriate amounts of Company's resources to advertisement and promotional pricing; (v) an ill-advised launch of an internet retail site; and (vi) the continued payment of "management fees" to companies affiliated with members of the Board of Directors that were not providing management services.

## Business Plan

69.    Adoption of a business plan or model is one of the most critical decisions for a company. Upon information and belief, Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, McKitrick, Segal, Suttin, Swartz, and Watts and Officers Fansler, Longnecker, McCollum, Starr, and Stanton failed to inform themselves, or ignored, material information available to them in adopting the business model for Quality Stores, as described above.

70.    Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, McKitrick, Segal, Suttin, Swartz, and Watts were grossly negligent in adopting and following, and Officers Fansler, Longnecker, McCollum, Starr, and Stanton were grossly negligent in following, a business model that did not realistically provide for revenues sufficient to service Quality Store's

debt. The above-identified LBO Defendants either ignored, or failed to consider, that the Company could not expand by hundreds of stores on a net basis, and that Quality Stores did not have access to sufficient capital to finance such unrealistic expansion, while continuing to service its debt.

## Computer Integration

71.     Due to the nature of its business as an agricultural products retailer, Quality Stores' financial success was entirely dependent on its product sales. Consequently, it was vital that the Company maintain its inventory at the proper levels. The Company's computer system, which tracked its inventory levels, was therefore crucial to the success of the Company.

72.     Upon information and belief, after the Quality LBO, Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Segal, Suttin and Watts and Officers Hurley, Maddox, Scarborough, Shilstra, Stanton, Starr and Tuit decided to integrate the computerized inventory replenishment systems of Quality Stores and Central Tractor into a single automated system. The above-identified Directors and Officers ignored, or failed to consider, the problems that would arise from such actions, and allowed the integration to occur in a haphazard and, ultimately, devastating manner. Indeed, such Defendants turned the instrumental project over to employees who were neither qualified, nor had any incentive, to handle the integration properly.

73.     The above-identified Directors and Officers did not properly monitor or supervise the integration. Beyond cursory updates given at meetings of the Board of Directors, which simply informed the Directors that the integration was taking place, the above-identified Directors and Officers took no other interest or action in the integration process.

74.     Prior to the Quality LBO, the purchasing and inventory processes at Quality Stores and Central Tractor were controlled centrally by the point-of-sale ("POS") and automatic

replenishment systems. Both companies monitored customer purchases and inventory levels with respect to every stock-keeping-unit ("SKU") in each store on a daily basis through the POS system. The POS systems of both companies were interconnected with their automated inventory replenishment system. The automated inventory replenishment system was used to automatically place orders for new inventory and provide for minimum stocking levels for lower volume items at all stores.

75.   Shortly after the Quality LBO, the above-identified Directors and Officers realized that the two systems could not be successfully integrated and decided to use the existing non-Y2K compliant automated replenishment and ordering system known as the "E-3 System" that had been used by Quality Stores before the merger (the "E-3 System").

76.   Prior to the merger, the E-3 System served approximately 114 stores with approximately 36,000 SKUs. Post-merger, the E-3 System was supposed to serve 347 stores, approximately 60,000 SKUs and a substantially increased number of vendors. The above-identified Directors and Officers knew or should have known that the E-3 System was not designed to handle the substantial increase in information required by the merging of the information systems, but failed to examine or adequately inform themselves as to whether the E-3 System could properly handle the increased number of stores, vendors and SKUs.

77.   In order for the E-3 System to become operational, upon information and belief, the above-identified Officers decided to reproduce historical sales of all of Central Tractor's, Country General's and other affiliated entities' SKUs in the E-3 System. The above-identified Officers did not adequately inform themselves of the feasibility of the underlying assumptions of this process. This process, referred to internally as "mapping," was crucial for the Company's future, since replenishment of the whole integrated company was contingent on the accuracy of this data and the E-3 System's ability to estimate the inventory requirements for the Company.

78.    Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Segal, Suttin and Watts and Officers Hurley, Maddox, Scarborough, Shilstra, Stanton, Starr and Tuit knew or should have known that the lack of a reliable computerized replenishment system would adversely affect the Company's business operations, by failing to correctly and timely order merchandise to maintain the required inventory levels at each of the Company's stores.

79.    Instead of reproducing Central Tractor's and Country General's actual historical data in the E-3 System, the above-identified Officers, upon information and belief, assumed without informing themselves, that items previously sold by Central Tractor had identical historical sales patterns as similar items sold by Quality Stores. This assumption was entirely incorrect and unsubstantiated because, historically, Quality Stores and Central Tractor had distinctly different product lines, targeted different buyers and operated in different regions with different sales and seasonality patterns. Neither the Directors nor the Officers analyzed or otherwise insured that the employees charged with the integration reviewed information relating to Quality Stores' sales patterns and inventory.

80.    Upon information and belief, the above identified Directors failed adequately to inform themselves about the mapping process.

81.    The substantial and critical mapping project was hastily accomplished over a mere week by a group of Company employees working in a hotel room. The above-identified Officers failed properly to supervise the mapping and integration process, entrusting the critical work to certain former officers of Central Tractor who were not expected to be employed by the new merged entity. Moreover, the above-identified Officers failed to include any Quality Stores' employees in the mapping process who would have been knowledgeable about Quality Stores' sales patterns and inventory. The above-identified Directors failed to adequately inform

themselves or were unaware of this fact. The above identified Officers knew or should have known that entrusting the supervision of the mapping process to officers who were not expected to stay with Quality Stores and had no vested interest in the Company's future success would likely result in n problems. Moreover, given the importance of the task, the above-identified Officers should have provided adequate supervision.

82.     Upon information and belief, Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Segal, Suttin and Watts and Officers Hurley, Maddox, Scarborough, Shilstra, Stanton, Starr and Tuit were responsible for testing, failed to adequately test the new E-3 System, and did not ensure there was an adequate information technology infrastructure in place by the time the Company switched Central Tractor's and Country General's inventory replenishment systems over to the E-3 System.

**Inventory Over-Ordering**

83.     In March 2000, when the Company improperly set up the new system, the E-3 System failed to estimate correctly the required SKU inventory levels at the Company's stores.

84.     Consequently, some SKUs were over-ordered, while others were under-ordered. As a result, the Company's distribution centers, where vendors initially delivered the merchandise, became virtually paralyzed. Even if a product was ordered and available at the distribution center, it could not be shipped to those stores that needed this product. Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Segal, Suttin and Watts either failed to become informed about these critical issues, which had the potential of ruining the company, or were grossly negligent in allowing the inventory over-ordering to continue.

85.     In March 2000, Defendant Stanton, who was responsible for the Company's marketing and merchandising, realized that the E-3 System was causing severe problems at the

Company's distribution centers. In response, Defendant Stanton recklessly ordered 100 additional trailers of spring merchandise to be delivered directly to the Company's stores from vendors, by-passing the distribution centers. Defendant Stanton did not have the expertise, nor avail himself of adequate information, necessary to make this decision.

86.    Defendant Stanton's reckless decision made the situation worse. The Company's inventory ballooned by approximately $100 million; yet the merchandise was still unable to reach the stores. Sales plummeted in all former Central Tractor and Country General stores because the E-3 System was not set-up to use the correct historical data for these stores. Former Quality Stores' locations were unaffected by the problem because the E-3 System used the actual historical data for Quality Stores.

87.    By the time the merchandise ordered by Defendant Stanton was delivered to the stores, the spring sale season was over. The Company was left with over $60 million in unsold spring merchandise, was lacking at least $20 million worth of fall inventory, had a past due debt of $30 million with its vendors and was 85 days past due with its vendors.

88.    Defendant Stanton's actions created an acute liquidity problem for the Company. Consequently, the Company was unable to order fall merchandise in the quantity required to satisfy its customers. The unsold spring merchandise was stored until next spring, at which time it was eventually sold below cost. The Company suffered a loss of $11.3 million as a result of this sale.

89.    Upon information and belief, Defendant Fansler also was fully aware of the computer integration problems and the problems with the E-3 System's failure to place replenishment orders throughout this period. He had substantial experience with the POS and the E-3 System as a former sales and marketing employee of Quality Stores. Despite the obvious consequences of his inaction, upon information and belief, Defendant Fansler did nothing to

either correct the problem or stop Defendant Stanton from over-ordering inventory and also failed timely to bring this serious problem to the attention of the Board, in breach of his obligations as a Director.

90.    Upon information and belief, at the end of 2000, the Company's computer systems were still not fully integrated.

**Accounts Payable Strategy**

91.    Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Segal, Suttin and Watts knew or should have known about the serious over-ordering problem.

92.    Upon information and belief, at or about the time Defendant Stanton over-ordered the spring merchandise, Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Segal, Suttin and Watts, and Officers Haines, Hurley, Starr, Tuit and Waack, in reckless disregard of the mounting over-ordering problem, also instituted a "trade-dating-for-discounts" strategy.

93.    The "trade-dating-for-discounts" arrangement had Quality Stores buying merchandise on a supplier's credit terms to receive larger discounts off a purchase price in exchange for a shorter term of repayment. This practice positioned the Company's trade payables to various suppliers as past due based on the unusually short payment term.

94.    The above-identified Directors and Officers knew or should have known about the over-purchase problem and its adverse ramifications for the Company's cash flow. The above-identified Directors and Officers failed adequately to inform themselves of the consequences of instituting the trade-dating-for-discounts in the light of the looming liquidity, slower sales and unsold inventory problems, which resulted in Quality Stores having even more excessive merchandise and a shorter payment period for the unsalable merchandise.

95.   As a result of the excess inventory and shorter repayment periods, the Company was left with large past due amounts, which, in turn, adversely affected the Company's credit standing and its ability to purchase merchandise on a supplier's trade credit terms, which are crucial in the retail business.

96.   Once again, the above-identified Defendant Directors and Officers failed to adequately inform themselves of the options, feasibility and potential downfalls before making the material decision for the Company.

## Vendor Bidding Process

97.   Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Segal, Suttin, and Watts and Officers Brown, Haines, Hurley, Mann, Scarborough, Starr, Tuit and Waack decided to institute a bidding process among vendors.  This process increased the number of vendors supplying the Company.  The program resulted in the loss of vendor loyalty and a deterioration of relationships with the past suppliers.  The program also caused problems with customers by introducing unknown and untested brands to the Company.

98.   The above identified Directors and Officers, who knew or should have known of the Company's financial problems caused by the over-ordering of the inventory, failed to consider the effect of the vendor bidding process, which led to slower sales due to use of previously unknown and untested brands and exacerbated the already mounting financial problems.

99.   The above-identified Directors and Officers undertook the new vendor relationship program without any meaningful analysis and failed adequately to inform themselves of its potential consequences to the Company.  In fact, the decision was not even addressed at the Board of Directors' meetings.

## Expansion

100.    As described above, pursuant to the business projections made by the LBO Defendants, Defendants needed to open an enormous number of new stores each year, on a net basis, to service the incurred debt, notwithstanding their knowledge that neither Quality Stores, nor Central Tractor or Country General had ever grown at the aggressive pace forecast as part of the Quality LBO.

101.    Pursuant to the business model, Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, McKitrick, Segal, Suttin, Swartz and Watts and Officers Fansler, McKitrick, Longnecker, McCollum, Starr and Stanton decided to open 25 new stores in 2000, which resulted in capital expenses of approximately $27.5 million.

102.    In direct conflict with the business model, Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Reinebach, Segal, Suttin and Watts and Officers Haines, Maddox, Starr, Tuit and Waack decided to close a total of 28 stores in 2000, including 11 "under performing" stores and 17 stores closed for the sole purpose of generating additional cash to alleviate Quality Stores' acute liquidity problems.

103.    Thus, in 2000, Quality Stores experienced a net decrease in the number of stores it operated, rather than the projected net increase in the number of stores, which was consistent with the historical pattern of both Quality Stores and Central Tractor prior to the Quality LBO. Upon information and belief, the above-identified Directors and Officer who made the grossly negligent decision to close stores to finance, among other things, the opening of a like number of new stores, failed adequately to inform themselves of the consequences of this decision, which resulted in almost $12 million in losses, including $4.5 million in inventory liquidation losses, $1.2 million for asset impairment and $6.1 million for remaining lease obligations and other exit

costs. The opening and closing of stores also required additional administrative expenses, adding to the already negative overall effect of the expansion strategy.

104.    In 2000, the Company's selling, general and administrative expenses ("SGA Expenses") rose dramatically by $48.2 million, or 19.2% as compared to 1999.  The combination of the Company's increased SGA Expenses, losses due to liquidated sales, lost volume rebates and cash discounts and payments issues, adversely impacted the Company's gross profit for fiscal year 2000, which decreased to 26.6% as compared to 29.1% in 1999.

105.    The above-identified Directors and Officers were grossly negligent in closing stores for the sole purpose of generating cash in order to finance, among other things, the opening a like number of stores.

**Advertising**

106.    The Defendants identified below allocated a disproportionate and inappropriate amount of Company's resources to advertisement and promotional pricing, which resulted in lower margins and, consequently, lower profits for the Company.  Moreover, Defendants' use of new and previously untested mediums of advertisement and promotions, such as television and concert sponsorships, went well beyond historical levels and the amount budgeted for advertising in 2000.  Upon information and belief, the Directors responsible for this ill-advised decision concerning a crucial investment of the Company's limited resources included Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Reinebach, Segal, Suttin and Watts.  The Officers responsible were Feichtner and Starr.

107.    Upon information and belief, the above-identified Directors and Officers increased advertisement and promotion expenses by $12 million in 2000 as compared with the amounts expended in 1999.

108.     The increase in spending on advertisement and promotion failed to produce any measurable benefit to the Company.  The Board itself recognized that this was an ill-conceived decision, which was not, upon information and belief, substantiated by any data or feasibility studies as to the effectiveness of either the new mediums of advertisement or the effect of the increase in advertisement expenses.

**On-line Retail**

109.     In addition to Defendants' reckless choices with regard to advertising and promotions on behalf of the Company, Defendants Bliss, Brown, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Hurley, Lamm, Longnecker, McKitrick, Reinebach, Segal, Shilstra, Suttin, Tuit, Waack and Watts also made an uninformed decision to initiate a new business through creation of an on-line retail store.

110.     In 1999, the Company conducted flawed surveys to determine whether its customers would buy products off a website.  Upon information and belief, these surveys were not based on any statistically proven methodology and for this reason could not produce any meaningful and reliable results.  The above-identified Defendants did not inform themselves regarding the reliability of these surveys. Instead, based on the inherently flawed results of these surveys, the Defendants precipitously decided to create an e-commerce subsidiary, FarmlandCountry.com, which would design, launch and maintain the on-line retail store.

111.     On June 9, 2000, the Company launched its website, www.FarmlandCountry.com.

112.     The website received little customer response and was promptly shut down.  All employees of the e-commerce subsidiary were fired, and the equipment purchased in order to run the website was brought to Des Moines, Iowa where the Company maintained the catalog-processing center.

113.    The Company admitted that the decision to start the internet site was disastrous, and, upon information and belief, was an uninformed and grossly negligent decision by the above-identified Officers and Directors.

**Management Fees**

114.    Along with the computer integration, inventory over-buy and business structure problems, Defendants were mismanaging corporate assets throughout this period.  Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Segal, Suttin, and Watts continued to authorize the payment of management fees to J.W. Childs and Fenway Partners, Inc. ("Fenway Partners"), two companies affiliated with Directors Childs, Dresdale, Lamm, Segal and Suttin.

115.    In 1997, J.W. Childs and Fenway Partners entered into agreements with Central Tractor to provide management and consulting services to Central Tractor for five years in exchange for management fees (each, "Management Agreement," and collectively, the "Management Agreements").

116.    Upon information and belief, between 1997 and January 1999, J.W. Childs received payments totaling at least $440,000, and Fenway Partners was paid at least $150,000. The Management Agreements were still in effect after the merger of Central Tractor and Quality Stores in May 1999.

117.    Upon information and belief, pursuant to the Management Agreement between J.W. Childs and the Debtors, J.W. Childs received fees totaling at least $470,000 in exchange for the alleged performance of management services on the Debtors' behalf in fiscal years 1999 and 2000.

118.    Additionally, upon information and belief, pursuant to the Management Agreement between Fenway Partners and the Debtors, Fenway Partners received at least

$120,000 in exchange for the alleged performance of management services on the Debtors'
behalf during fiscal year 2000.

119.    The above-identified Directors knew or should have known that these payments
were made to entities affiliated with Directors Childs, Dresdale, Lamm, Segal and Suttin.  No
decision of the disinterested majority of the board was made concerning whether the
continuation of these payments was in the interest of the Company.

120.    Upon information and belief, neither J.W. Childs nor Fenway Partners performed
any material management services for the Debtors during fiscal years 1999 or 2000 under the
Management Agreements.  Notwithstanding such fact, the above-identified Directors failed to
halt the improper payment of such monies.

## FIRST CLAIM FOR RELIEF
### (Objection To Defendants' Proofs Of Claim)

121.    Plaintiffs reallege paragraphs 1 through 120, as though fully set forth herein.

122.    In accordance with Bankruptcy Rule 3007, Plaintiffs object to the proofs of claim
filed by Defendants Childs, Horn, Reinebach, Segal, Suttin, Trilling, Waack, and Watts in the
Chapter 11 Cases.

123.    Pursuant to 11 U.S.C. § 502(b), Plaintiffs object to the proofs of claim filed by
Defendants Childs, Horn, Reinebach, Segal, Suttin, Trilling, Waack, and Watts on the ground
that each claim is unenforceable against the Debtors and property of the Debtors under
applicable law.

124.    Additionally, pursuant to 11 U.S.C. § 502(e), Plaintiffs object to the proof of
claim filed by Defendants Childs, Horn, Reinebach, Segal, Suttin, Trilling, Waack, and Watts on
the ground that each claim should be disallowed as a claim for reimbursement or contribution
that was contingent as of the time the proofs of claim were made.

125.    Accordingly, under 11 U.S.C. §§ 502(b) and 502(e), each proof of claim filed by Defendants Childs, Horn, Reinebach, Segal, Suttin, Trilling, Waack, and Watts should be disallowed and expunged in its entirety.

## SECOND CLAIM FOR RELIEF
(Breach Of Fiduciary Duties By Directors)

126.    Plaintiffs reallege paragraphs 1 through 125, as though fully set forth herein.

127.    During the course of his tenure as a Director of the Debtors, each Director and LBO Director was under a duty to discharge his duties as a director in (a) good faith, (b) with the care an ordinarily prudent person in a like position would exercise under similar circumstances and (c) in a manner he reasonably believed to be in the best interests of the corporation.

128.    In breach of their fiduciary duties, the Directors and the LBO Directors mismanaged the Debtors, committed waste and failed to preserve the Debtors' assets, thereby allowing the assets of the Debtors to dissipate to the detriment of the Debtors and their creditors, as described above.  Alternatively, even if each of the above described actions and inactions of the Directors and the LBO Directors was merely negligent, taken together the series of actions and inactions constitute gross negligence by the Directors and the LBO Directors.

129.    The Debtors suffered damages as a direct result of the Directors and the LBO Directors' breaches of their fiduciary duties.

## THIRD CLAIM FOR RELIEF
(Breach Of Fiduciary Duties By Officers)

130.    Plaintiffs reallege paragraphs 1 through 129, as though fully set forth herein.

131.    During his tenure as an Officer of the Debtors, each Officer was under a duty to exercise care and loyalty to the Debtors and to discharge his functions as an officer in the best interests of the Debtors.

132.    In breach of their fiduciary duties, the Officers and the LBO Officers mismanaged the Debtors, committed waste and failed to preserve the Debtors' assets, thereby allowing the assets of the Debtors to dissipate to the detriment of the Debtors and their creditors, as described above.  Alternatively, even if each of the above described actions and inactions of the Officers and the LBO Officers was merely negligent, taken together the series of these actions and inactions constitute gross negligence by Officers and the LBO Officers.

133.    The Debtors suffered damages as a direct result of the Officers' breaches of their fiduciary duties.

## FOURTH CLAIM FOR RELIEF
(Negligent Inaction)

134.    Plaintiffs reallege paragraphs 1 through 134, as though fully set forth herein.

135.    By their unconsidered failure to take appropriate steps to correct the problems associated with (i) the adoption of a business model that failed to provide for revenues sufficient to service debt; (ii) an inventory over-buy that resulted from the Company's failure to integrate the computer systems of the merged companies into a properly functioning computer system; (iii) the institution of an imprudent accounts payable strategy; (iv) the disproportionate allocation of inappropriate amounts of Company's resources to advertisement and promotional pricing; (v) an ill-advised launch of an internet retail site; and (vi) the continued payment of "management fees" to companies affiliated with members of the Board of Directors that were not providing management services, Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Segal, Suttin and Watts were negligent by inaction.

136.    By their unconsidered failure to take appropriate steps to correct the problems associated with the adoption of an inappropriate business model, the integration of the computer systems, the inventory over-buy, the institution of an imprudent accounts payable strategy, the

disproportionate allocation of inappropriate amount of Company resources to advertisement and promotional pricing, and the ill-advised launch of an internet retail site, Officers Bliss, Brown, Fansler, Feichtner, Hurley, Longnecker, Maddox, Mann, McCollum, McKitrick, Reinebach, Scarborough, Segal, Shilstra, Stanton, Suttin, Swartz and Waack were negligent by inaction.

137.    Such Directors' and Officers' failure to act was the proximate cause of losses suffered by the Debtors and the estate.

## FIFTH CLAIM FOR RELIEF
### (Corporate Waste)

138.    Plaintiffs reallege paragraphs 1 through 137, as though fully set forth herein.

139.    Directors Bliss, Childs, Dresdale, Fansler, Gorgi, Hilt, Horn, Lamm, Longnecker, McKitrick, Reinebach, Segal, Suttin, Waack and Watts committed corporate waste with full knowledge that they were allowing the assets of the Debtors to dissipate to the detriment of the Debtors and their creditors.

## SIXTH CLAIM FOR RELIEF
### (Attorney's Fees And Costs)

140.    Plaintiffs reallege paragraphs 1 through 139, as though fully set forth herein.

141.    Pursuant to Bankruptcy Rule 7008(b) and based on the allegations of this Complaint, Plaintiffs request that they be awarded their attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, QSI Holdings, Inc. and Quality Stores, Inc., for and on behalf of the Debtors, their estates and creditors, respectfully request that the Court: (a) enter judgment against the Defendants for damages as a result of their breaches of fiduciary duties, negligent inaction and corporate waste, including, but not limited to, the diminished value of the Debtors; (b) award Plaintiffs their attorneys' fees and costs; and (c) grant Plaintiffs such other and further relief as is just and proper.

Dated:  December 5, 2003.

Respectfully submitted,

By

Robert S. Hertzberg (P30261)
PEPPER HAMILTON LLP
100 Renaissance Center, Suite 3600
Detroit, Michigan 48243
Phone: (313) 259-7110

-and-

John K. Cunningham
WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Phone: (305) 371-2700

Glenn M. Kurtz
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
Phone: (212) 819-8200

Attorneys for QSI Holdings, Inc. and
Quality Stores, Inc. by their Chief Litigation
Officer